IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                          **CRIMINAL ACTION No.: 3:22-cr-114-HTW-ASH**

**CHRISTOPHER BURSE**

---

## MEMORANDUM OPINION AND ORDER

---

Before this Court is Defendant Christopher Burse's ("Defendant" or "Burse") Amended Motion to Suppress [Doc. 39]. Having considered the testimony adduced at the suppression hearing, the parties' written submissions, the applicable law, and the record, this Court finds that the motion should be denied for the reasons stated *infra*.

## I.    PROCEDURAL HISTORY

On May 24, 2023, Defendant Christopher Burse filed his Amended Motion to Suppress seeking to exclude certain evidence seized from his Dodge Charger ("The Charger") and two digital safes that were located in that vehicle. All items, including the automobile, were searched by law enforcement without a search warrant. The search yielded incriminating evidence against Burse. Burse was indicted on November 1, 2022, by a federal grand jury of being a felon in possession of a firearm. The United States opposes Burse's motion in all its particulars.

In December 2024, by agreement of the prosecution and defense, this Court conducted a combined suppression hearing and bench trial on the merits of this matter. On May 27, 2025, this Court heard further arguments and issued oral rulings. Upon the conclusion of oral arguments, this

Court directed the parties to file supplemental briefing on specific Fourth Amendment[1] issues: standing; abandonment; inventory; search-incident-to-arrest; and inevitable discovery. The parties submitted their supplemental briefs on June 16, 2025 [Docs. 66 and 67]. The motion is now ripe for decision.

## II.    BACKGROUND

On August 23, 2022, deputies with the Lauderdale County, Mississippi Sheriff's Department responded to a report of a suspicious vehicle trespassing on private rural property located at 89 Luther Walker Road, Lauderdale County. The car itself was sitting still, with its engine completely off. The road was a private one, pertinent only to the trees, underbrush, pebbles and dirt, and the land around it, as it was not a conduit to any other main roadway, or paved intersection.

Deputy Justin Harper ("Deputy Harper") was the first law enforcement officer to arrive on the scene. Upon his approach, Deputy Harper observed a Dodge Charger parked on the country road in the wooded area. Deputy Harper testified that once on the scene "[he] observed a Black make standing outside the vehicle, and as soon as [Deputy Harper] stepped out of [his] patrol vehicle, [Burse] dove back into the car." Motion Hr'g Tr. Vol. 1, 25-26. Deputy Harper informed the Court that at the time "[he] immediately began giving [Burse]commands to get out of the car because [Deputy Harper] could not see what [Burse] was doing inside the vehicle. *Id*. After approaching Defendant Burse, Deputy Harper claims "[o]nce I made contact with [Burse] I

---

[1] U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

identified him, […] I ran [Burse] through our Dispatch, and [Burse's records] c[a]me back maybe a few minutes later with a possible warrant for [Burse's] arrest through a different agency. Motion Hr'g Tr. Vol. 1, 26.

The sole occupant of the vehicle was later identified as the Defendant, Christopher Burse, the owner of the car. From outside the vehicle, Deputy Harper saw several items in plain view. He testified:

> I noticed a lot of stuff inside the vehicle, a lot of it being clothing items, but I noticed a particularly large safe in the passenger seat that was covered in red clay mud at the time. And then [Burse's] behavior was not normal. It was very standoffish. [Burse] wasn't engaging with me when I was asking him questions and talking to [Burse]. [Burse] was looking away from me. And my—[Burse] just wasn't acting normal.

*Id*. at 27.

Deputy Harper maintains that after learning Burse had an active warrant for his arrest and was deemed armed and dangerous, he "waited for another officer to come up. Once the other officer got up there and [Deputy Harper] had a little bit of support, [he] then placed Burse in wrist restraints and walked [Burse] to [his] patrol vehicle." Motion Hr'g Tr. vol 1, 30. Deputy Harper claims further that when his supervisor, Major John Calhoun ("Major Calhoun"), arrived at the scene, Deputy Harper briefed Major Calhoun of the situation and the two proceeded to do a body-camera inventory of the vehicle pursuant to an oral directive from the Chief Deputy stating that body-cameras could be used to conduct an inventory search. *Id*. at 30-34; *see also Id*. at 62. At some point during the alleged inventory search of the vehicle, after Burse was handcuffed and placed in the vehicle, Deputy Harper asked Burse several questions without mirandizing him.

Deputy Harper requested Burse's identification, whereupon he learned that Burse did not have a valid driver's license[2]. Upon radioing Burse's situation to Dispatch, Deputy Harper learned that Burse had outstanding arrest warrants issued by the State of Indiana for domestic battery[3] and also under Indiana law, for being a felon in possession of a firearm[4]. Dispatch further warned Deputy Harper that officers should consider Burse "armed and dangerous". Additional officers, including Major Calhoun then arrived on the scene.

The Deputies, following departmental policy[5], had The Charger towed to a local towing/impound lot. Towing seemed to be the best option. The Deputies could not leave the automobile where they encountered it, as the car was parked on private property and if observed by persons of ill intent, could be vandalized. They could not allow Burse to drive the vehicle any longer, since he did not have a valid driver's license. Nor were any of the Deputies expected to drive Defendant's vehicle to the jail, and risk liability. Further, Indianapolis Metropolitan Police

---

[2] Miss. Code Ann. § 63-1-5 makes it unlawful for any person to drive a motor vehicle on public roads without a valid operator's license. Miss. Code Ann. § 63-1-41 explicitly requires that every licensee "shall have his license in his immediate possession at all times when operating a motor vehicle and shall display the same, upon demand, to any officer."

[3] Domestic Battery: Governed by Indiana Code § 35-42-2-1.3. While the baseline offense is a Class A misdemeanor, it escalates to a felony (ranging from a Level 6 to a Level 2 felony) under aggravating circumstances, such as when it is committed in the physical presence of a child under 16, involves a deadly weapon, results in bodily injury, or if the offender has a prior unrelated battery conviction.

[4] The precise statutory designation underlying the out-of-state firearm warrant was Possession of a Firearm by a Serious Violent Felon, governed by Indiana Code § 35-47-4-5. Under subsection (c) of this statute, it is a Level 4 felony for a person classified as a "serious violent felon" to knowingly or intentionally possess a firearm. The statute explicitly lists preceding qualifying offenses that trigger this designation, which include murder, kidnapping, robbery, and certain elevated levels of battery.

[5] *See* Lauderdale County Sheriff's Department Law Enforcement Policy No. 4.27, Towing/Impounding of Motor Vehicles, Document no. 32-1, p.1.

Department had placed an NCIC[6] evidence hold on the Dodge Charger. Accordingly, the Deputies contacted the towing company to notify it of the hold on The Charger.

While awaiting the arrival of a tow truck, the Deputies conducted an inventory search of the contents of the automobile. During that process, deputies located marijuana[7]. Major Calhoun stated that due to the number of items within the vehicle, he needed his body camera expeditiously to document the items, instead of using a cumbersome inventory form (G-2 at Part 1, 10:54). In addition to the marijuana, Major Calhoun observed two safes- the previously-mentioned large digital safe on the front seat, and another smaller "keyed" safe, seen on the rear passenger floorboard. Deputies seized the safes and documented them on a property receipt.

Burse objected to the Officers seizing and opening the safes. Several times during the search, he told the Deputies, especially Major Calhoun, that the safes were not his, but belonged to his mother. (*See e.g.* G-1 at Part 1, 4:29; G-2 at Part 1, 8:28). The entire time, after Dispatch advised Deputy Harper that Burse was an armed and dangerous fugitive, Burse had not been free to go, and was under arrest. The Deputies took Burse to jail.

Later that same day, on August 23, 2022, Burse was "booked" into jail. During the booking, the Defendant was instructed to turn around and face the wall, so a corrections officer could search him. The Defendant refused. Deputy Harper noticed that the Defendant was clenching something in his hand. Once corrections staff placed the Defendant on the ground, he opened his hand and

---

[6] National Crime Information Center is a nationwide, computerized index of criminal justice information managed by the Federal Bureau of Investigation (FBI).

[7] Plaintiff United States of America avers that "[d]uring the inventory, Deputy Harper located a baggie of marijuana within a pill bottle from the passenger side door, as well as a blunt containing marijuana from a compartment under the radio." Docket no. 66 at 2.

keys fell to the ground. They keys were seized by law enforcement. The Defendant was asked if the keys were to the safes (G-1 at Part 3, 6:48). The Defendant stated no. (G-1 at Part 3, 6:510. It was later confirmed that these keys could open the small black safe. Furthermore, during the correctional search, officers located a clear plastic baggy containing approximately 20 colorful pills tied to the defendant's underwear under his genitals.

Later that morning, East Mississippi Drug Task Force (EMDTF) Agent David Creel was assigned to further investigate the Defendant and his outstanding warrants. EMDTF Major  Lea informed Agent Creel that the Defendant did not want law enforcement to take the safes and how there might be evidence related to the Indiana warrants. Agent Creel reviewed the NCIC printout for the Defendant, which showed that he had felony warrants for: Possession of a Firearm by a Serious Violent Felon; Battery by Means of Deadly Weapon; Battery Resulting in Serious Bodily Injury; Domestic Battery Resulting in Moderate Bodily Injury; and Domestic Battery (D-8). Relative to the outstanding felony arrest warrants, law enforcement maintains that the felony warrants "stemmed from a domestic assault between the Defendant and his girlfriend (D-9). During the altercation, a cousin of the victim tried to stop it, and Defendant allegedly shot the cousin multiple times." (D-9).

Deputies subsequently obtained search warrants from a Lauderdale County Justice Court Judge for both safes. The officers then made a more detailed search of the safes, and discovered, among other items, the firearm and ammunition. Law enforcement later obtained a separate warrant for the search of the vehicle itself, presumably to continue the search for evidence bearing on the outstanding felony warrants. The search yieled a marijuana pipe.

As stated above, Burse now seeks to suppress all evidence recovered from the safes and from his vehicle. He argues that law enforcement violated his Fourth Amendment rights through an unlawful seizure and search. As this Court earlier stated, the officers originally had no search warrants. Their application for such came much later—after the initial encounter and after they had taken possession of both safes and the automobile.

This scenario, challenged on constitutional grounds,  requires this Court to examine the contours of the Fourth Amendment, as well as the jurisprudence undergirding warrantless searches: namely, that pertaining to constitutional standing; plain view; search incident to an arrest; abandonment; inventory; and inevitable discovery.

### III.    ANALYSIS

**A.  Overview**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The Fourth Amendment, then, pertains to reasonable searches, either those conducted under a lawfully-issued search warrant, or those executed pursuant to the various exceptions to the warrant requirement.

**B. Exceptions to the Judicially-Approved Warrant Requirement**

The Fourth Amendment, with its emphasis on judicially-approved searches by warrants, does not unequivocally prohibit warrantless searches. Legions of federal cases, all the way up to the United States Supreme Court, constantly have pronounced that the reach of the Fourth Amendment's warrant protocol blessed by a judicial officer has a number of exceptions, to wit:

1. Search Incident to a Lawful Arrest. *See Chimel v. California*, 395 U.S. 752 (1969).

2. The Automobile Exception. *See Carroll v. United States*, 267 U.S. 132 (1925)

3. Plain View. *See Horton v. California*, 496 U.S. 128 (1990).

4. Consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

5. Stop and Frisk. *See Terry v. Ohio*, 392 U.S. 1 (1968).

6. Abandoned Property. *See California v. Greenwood*, 486 U.S. 35 (1988).

7. Hot Pursuit. *See Warden v. Hayden*, 387 U.S. 294 (1967).

8. Imminent Destruction of Evidence. *See Kentucky v. King*, 563 U.S. 452 (2011).

9. Emergency Aid. *See Brigham City v. Stuart*, 547 U.S. 398 (2006).

10. Inventory Searches. *See Dakota v. Opperman*, 428 U.S. 364 (1976).

11. Border Searches. *See United States v. Flores-Montano*, 541 U.S. 149 (2004).

12. Administrative/Highly Regulated Industry Inspections. *See New York v. Burger*, 482 U.S. 691 (1987).

13. "Special Needs" of Public Institutions. *See New Jersey v. T.L.O*, 469 U.S. 325 (1985).

When Burse voluntarily chose to pilot his vehicle onto a country road in rural Lauderdale County, Mississippi, he knew that as a citizen of the United States he possessed various constitutional rights and an unflagging obligation to obey the law. That he knew something about the Fourth Amendment's protection against unlawful searches and seizures was manifest early on,

as he protested numerous times that his rights were being violated. That he understood property law and its shield against trespassers is evidenced as, when discovered on this country road, he was quick to justify his presence there on his submitted excuse that he was lost, that is, that he had not deliberately driven onto private property.

### C. Legal Observations

#### a. Trespass

First up: suspected trespass. Universal Mississippi law provides land owners with a right of exclusion. *See e.g. Hughes v. Star Homes, Inc.*, 379 So. 2d 301 (Miss. 1980) (defining trespasser as "one who enters upon another's premises without license, invitation or other right," and affirming that a landowner's possessory interest is inherently protected against individuals who enter private property purely for their own purposes, convenience, or curiosity without explicit or implied consent); *Craft v. State*, 181 So. 2d 140 (Miss. 1965) (holding that an unauthorized physical entry onto an interior area or private porch where a property owner retains the right of exclusive control constitutes a trespass). Unwelcome guests, under state or municipal statutes[8], confirmed by ample jurisprudence, are forbidden to penetrate without permission or operation of law, the boundaries of lands deemed "private".

No one disputes that law enforcement encountered Burse after his vehicle, located on someone else's private property, had been the subject of a call to the police as a "suspicious vehicle". Whether the wooded area surrounding the country road was occupied by expensive

---

[8] Miss. Code Ann. § 97-17-93 establishes the standard misdemeanor offense for entering private property without authorization; Miss. Code Ann. § 97-17-97 addresses situations where an individual has received advanced warning or defies an order to leave; Miss. Code Ann. § 97-17-87 serves as a catch-all criminal provision for any person who participates in a willful or malicious trespass upon the real or personal property of another for which no other specific statutory penalty is prescribed.

horses and cows, the record does not reveal. Or whether a vulnerable home was a short distance away is also a matter not in the record. But the record reflects, without challenge, that Burse was there, voluntarily and alone…just standing there when an alerted law enforcement officer showed up in his marked police car.

The law of trespass in Mississippi is uncomplicated. *See Hughes* and *Craft*, *supra*. To determine if Burse was lawfully on the property, Deputy Harper questioned Burse as to his purpose for being there. Burse had no license to operate a motor vehicle. The Officer gathered Burse's name and other information and called Dispatch to determine if Dispatch had any data which might show a harmless, lost traveler, or someone else whose profile might signal a different answer to the specific questions posed by the Officer.

Dispatch responded. Christopher Burse: wanted in the State of Indiana for the crime of domestic battery and being a serious violent offender in possession of a firearm. He should be considered "armed and dangerous"!

The Officers, then, had the right, for their protection, to search Burse himself, and to assure themselves that he did not have an opportunity to retrieve a dangerous weapon from his immediate vicinity. That allowable search area has been described as the "lunging area" *Chimel v. California*, 395 U.S. 752 (1969) , the area from which an arrestee might obtain a weapon by lunging for it.

### b.  Standing

Search and seizure jurisprudence and forbearance are triggered by a movant who has "standing" to do so. This is a term which means that the individual possesses an expectation of privacy. Standing is adequately described in *Rakas v. Illinois*, 439 U.S. 128 (1978) )(finding that

the essential inquiry for Standing is "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect").

Fourth Amendment rights are personal and may not be asserted vicariously. *Rakas*, 439 U.S. at 130 n.1. A defendant therefore bears , the burden of establishing a legitimate expectation of privacy in the place searched or the item seized. *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011). Burse, the challenger here, thus, must personally show "standing" in order for this court to examine his contended Fourth Amendment violations.

Since Burse possessed the car, which possessed the safes, this court finds that Burse had "standing" to raise a Fourth Amendment alleged violation. But "standing" alone may not win the day for a critic. *See e.g. Rakas* (holding that capacity to claim the protection of the Fourth Amendment depends not upon a stand-alone concept of "standing", but upon whether the person who claims the protection has a legitimate expectation of privacy in the invaded place); *Rawlings v. Kentucky*, 448 U.S. 98 (1980)( holding that property ownership, standing alone, is insufficient to sustain a Fourth Amendment challenge and that a defendant must demonstrate a legitimate expectation of privacy in the particular area searched). As earlier stated, this court is satisfied that Burse has "standing" to challenge the search of the safes.

### c.  Abandonment

So, next, this Court must examine the concept of abandonment. Burse never claimed the safes were his; instead, Burse bemoaned that the safes belonged to his sick mother, who, obviously, was not present at the scene.

In the context of the Fourth Amendment, abandonment occurs when an individual, through his/her words, acts, or objective behavior, voluntarily divests himself/herself of any legitimate expectation of privacy in a particular piece of property. *See Abel v. United States*, 362 U.S. 217 (1960); *California v. Hodari D.*, 499 U.S. 621 (1991). Fifth Circuit law proclaims that explicitly disclaiming ownership or knowledge of property when questioned by law enforcement constitutes a voluntary relinquishment of an expectation of privacy, depriving the defendant of standing to challenge a subsequent search. *See United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973) (en banc). Should this court hold that Burse abandoned the safes, Burse cannot complain that Officers violated his Fourth Amendment right when the Officers opened the safes and found incriminating evidence against him. *See United States v. Anderson*, 500 F.2d 1311 (5th Cir. 1974); *United States v. Canady*, 615 F.2d 694 (5th Cir. 1980).

At every opportunity, Burse protested that the safes were not his. He exclaimed to Deputy Harper that the safes belonged to his sick mother. He repeated this disclaimer to Major Calhoun, while the two were still on the private property. At the Detention Center, Burse again sought to distance himself from the safes. He refused to submit to a search of his person and had to be wrestled to the floor to make him open his hand that contained a set of keys. He falsely stated that the keys did not open the small safe. Moreover, when Agent Creel, at the Detention Center, asked Burse for the combination to the large safe, Burse stated the large safe was not his property.

Without doubt, Burse feared that the contents of the safes would incriminate him, so he was intent on denying any connection to whatever that unwanted item(s) might be. For several minutes that day, Burse desperately pleaded with law enforcement not to open those safes. Understandably so, as the large safe contained one Mini-Draco firearm with two magazines taped

together and sixty-eight (68) rounds of ammunition. The small safe contained a black and red mask and Burse's social security card.

The law of abandonment does not manifest the precise number of times a protester has to repeat his disclaimers. *See, e.g.*, *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc) (holding that the issue of abandonment is primarily a question of intent to be inferred from words spoken, acts done, and other objective facts, rather than a rigid or technical formula); *United States v. Powell*, 732 F.3d 361, 374–75 (5th Cir. 2013) (focusing the abandonment inquiry on whether the totality of a defendant's objective behavior and verbal disclaimers sufficiently demonstrated a voluntary relinquishment of his/her privacy interest at the time of the search). But if any reasonable number is suggested, the remonstrations of Burse would surely surpass that number. Further, if the number of cars subjected to denials of relationship to an item increase the applicability of abandonment, Burse's situation would more than meet any reasonable test. Lastly, if the abandonment test included considerations of persistence and repetition, Burse's conduct surely would embrace any notion of abandonment.

Ample caselaw support the above logic: *See United States v. Colbert,* 474 F.2d 174 (5th Cir.1973); *United States v. Anderson*, 500 F.2d 1311 (5th Cir.1974); *United States v. Canady*, 615 F.2d 694 (5th Cir.1980); *United States v. Garcia*, 849 F.2d 917 (5th Cir. 1988); *United States v. Roman*, 849 F2d 920 (5th Cir. 1988*); United States v. Karman*, 849 F.2d 928 (5th Cir. 1988); *United States v. Piaget*, 915 F.2d 138 (5th Cir. 1990); *United States v. Wolfe*, 983 F.2d 232 (5th Cir. 1993); *United States v. Thomas*, 12 F.3d 1350 (5th Cir. 1994); *United States v. Powell*, 732 F.3d 361 (5th Cir. 2013); *United States v. Escamilla*, 852 F.3d 474 (5th Cir. 2017).

Accordingly, this court is persuaded that Burse, by abandoning the safes, eschewed an expectation of privacy and any entitlement to Fourth Amendment protection.

In sum, this Court is persuaded that Burse's remonstration about his mother's ownership of the safes constitute abandonment of the safes, and the loss of Burse's opportunity successfully to protest the search of the safes. *See Chimel*, supra; *see also United States v. Robinson*, 414 U.S. 218 (1973).

### d.  Inventory Search

As discussed earlier in this Opinion, the Officers had no viable choice relative to the safety of the vehicle and its contents, other than to have the vehicle towed; but before doing so, the Officers had to inventory its contents.

"The Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only unreasonable searches and seizures." *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976). Under *Opperman*, warrantless "inventories pursuant to standard police procedures are reasonable" and therefore do not violate the Fourth Amendment. *Id.* at 372. The *Opperman* Court found that inventory searches occur in a "noncriminal context" and serve three main purposes: (1) to protect an owner's property while it is in the custody of the police; (2) to ensure against claims of lost, stolen, or vandalized property; and (3) to guard the police from danger. *Id.* at 369, 371 n.5. Based on these considerations, the *Opperman* Court held that the contents of vehicles taken into police custody may be inventoried without a warrant, probable cause, or reasonable suspicion. *Opperman.* at 375-76.

*Opperman* has been followed by a potpourri of judicial decisions. See *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983); *Colorado v. Bertine*, 479 U.S. 367, 371 (1987), etc. Although most inventory searches are conducted according to "standardized criteria or established routine" *Bertine*, 479 U.S. at 374 n.6., because reliance on such standardized criteria or routine practice ensures that the inventory search is not a "ruse for a general rummaging in order to discover incriminating evidence," *Florida v. Wells*, 495 U.S. 1, 4 (1990), failure to follow-through with standard procedures does not necessarily render the search unreasonable. *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010). The United States Supreme Court has noted that "there is no reason to insist that inventory searches be conducted in a totally mechanical "all or nothing" fashion. *Wells*, 495 U.S. at 4. Thus, courts regularly have upheld inventory searches when an officer's performance, while technically not in conformance with applicable procedures, was reasonable under the circumstances. *See e.g., United States v. Hockenberry*, 730 F.3d 645, 660-61 (6th Cir. 2013); *United States v. Garreau*, 658 F.3d 854, 857-58 (8th Cir. 2011); and *United States v. Reyes-Vencomo*, 866 F. Supp. 2d 1304, 1350-51 (D.N.M. 2012).

Valid inventories may be conducted on the road while the police wait for a tow truck, as here, to remove the vehicle to the police station. *Prescott*, 599 F.2d at 105. The fact that an inventory, as here, began with an examination of the trunk of the car does not show unconstitutional purpose. Additionally, the fact that Major Calhoun and Deputy Harper chose to video the contents of the vehicle rather than to utilize a written inventory sheet similarly does not invalidate the inventory, since this procedure was reasonable in view of the number of items located in the car. Major Calhoun and Deputy Harper testified that the police department allowed for video inventory when the vehicle contains an abundance of items. In short, the Government is

not required to prove that the officers strictly adhered to the governing regulations in every respect. *See, e.g., United States v. Cartwright*, 630 F.3d 610, 616 (7th Cir. 2010).

Once the law enforcement officers embarked on conducting a thorough inventory, they were warranted in inspecting and recording all contents of the car, including the contents of the two safes. This Court holds, then, that the Deputies reasonably substantially complied with police departmental policy in conducted the inventory in this case.

### e. Inevitable Discovery

Even if a Fourth Amendment violation had occurred, the inevitable-discovery doctrine renders the suppression unwarranted. For the doctrine to apply, the government must establish by a preponderance of the evidence that "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *Jackson*, 596 F.3d at 241. Moreover, "[i]n certain circumstances ... such as when the hypothetical independent source comes into being only after the misconduct, the absence of a strong deterrent interest may warrant the application of the inevitable discovery exception without a showing of active pursuit by the government in order to ensure that the government is not unjustifiably disadvantaged by the police misconduct." *United States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir. 1985).

Several approaches support inevitable discovery. First, as previously mentioned, the Deputies could not leave the automobile where they encountered it, as the car was parked on private property and if observed by persons of ill intent, could be vandalized. They could not allow

Burse to drive the vehicle any longer, since he did not have a valid driver's license. Nor were any of the Deputies expected to drive the Defendant's vehicle to the jail, and risk liability. The only viable option was to have the Dodge Charge towed, whereupon the towing company would have had to conduct an inventory, in conjunction with the police, for liability protection. This inventory would have yielded the presence of marijuana in the car; the firearm and ammunition in the large safe; and a suspicious mask and social security card in the small safe. This scenario would have unfolded based upon the Defendant not having a valid driver's license.

Next, at the Detention Center, the Defendant was booked, and during that process, drugs were found on his person under his genitals. Approximately 20 colorful pills were located in a clear plastic baggy. Whether the Defendant had additional baggies in his automobile could only have been determined by conducting a search of the automobile and the safes.

Finally, law enforcement in the Indianapolis Metropolitan Police Department had placed an NCIC evidence hold on the Dodge Charger. This Court agrees with the prosecution that "it reasonably follows that the Indianapolis Metropolitan Police Department deemed the vehicle and its potential contents as evidence related to their incident. Consequently, had the deputies not inventoried the vehicle and instead towed it to the impound, it is reasonably probable that Indianapolis Metropolitan Police Department would have searched the vehicle and its contents. Moreover, Indianapolis Metropolitan Police Department was actively pursuing their investigation into the vehicle being potential evidence prior to the Deputy's inventory." Docket no. 66, p.15. Since the Defendant allegedly had shot someone in Indiana, upon return of the car to Indiana, the Indiana Police would have impounded the car, inventoried its contents, while they procured a

search warrant for the car and its contents to obtain evidence of a firearm matching their ballistics for the alleged shooting.

## IV.    CONCLUSION

The Fourth Amendment does not forbid reasonable police work carried out pursuant to established exceptions to the warrant requirement. This Court has determined that Burse was lawfully arrested and eventually searched subject to the arrest, whereupon he was discovered to be in possession of illegal substances; that he abandoned the safes; that the police conducted a lawful inventory of the car and the safes; that probable cause justified the seizure of the safes; and  that the evidence would have been inevitably discovered. For all these reasons, this Court **DENIES**, as it must, Defendant Christopher Burse's Motion to Suppress.

**SO ORDERED this the**   3rd   **day of**   June   **, 2026.**

**/s/HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**